IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff*, | Criminal No. 2:21-cr-29 - 1 |
| v. | Hon. William S. Stickman IV |
| DAJUNATAE ALSTON *also known as* DEJUNTATE ALSTON, | |
| *Defendant*. | |

**MEMORANDUM OPINION**

WILLIAM S. STICKMAN IV, United States District Judge

Defendant Dajunatae Alston ("Alston") filed a Motion to Suppress Evidence arguing that the stop of the vehicle he was driving was unlawful, his detention was not supported by reasonable suspicion or probable cause, and the evidence recovered from his person and the vehicle was the result of an unconstitutional warrantless search.[1] (ECF No. 38). The Government filed a Response arguing that the initial stop of the vehicle was supported by reasonable suspicion because Alston was driving with a suspended driver's license. Further, it argued that the detention of Alston was reasonable, and the officers lawfully searched Alston and the vehicle. (ECF No. 48). The Court held an evidentiary hearing on Alston's motion, and the parties were given the opportunity to submit additional briefing afterwards, which they did. (ECF Nos. 59, 63 and 64).

Alston now concedes that the officers "were justified in pulling [him] over for driving with a suspended license." (ECF No. 62, p. 4). He only argues that the search of his person after

---

[1] The Court has jurisdiction over Alston's suppression motion under 18 U.S.C. § 3231.

1

he was removed from the vehicle was illegal, and everything that was obtained thereafter – from his person and the vehicle – should be suppressed. (ECF No. 62, pp. 4-5). After careful consideration of the record, the evidence, and the parties' arguments, the Court will deny Alston's suppression motion for the following reasons.

## I. RELEVANT FACTS[2]

On April 22, 2020, at approximately 7:28 p.m., City of Pittsburgh Zone 5 Detectives Lucas Burdette ("Detective Burdette") and Nathan Dettling ("Detective Dettling"), members of the Violence Prevention and Intelligence Unit,[3] were traveling in their unmarked police car on Lincoln Avenue. From an intersection, they observed Alston in the driver's seat of a vehicle parked on Deary Street. (ECF No. 59, pp. 9-13, 15, 69-71, 93, 96-97, 99, 123); (Government Exhibit 1). Both detectives had had an unobstructed view of Alston through the front windshield. It was a clear, although overcast, day. (ECF No. 59, pp. 16, 99-100, 106).

Alston was known to the detectives for a number of reasons. First, they had numerous encounters with Alston. (*Id.* at p. 125). Second, they knew he lived in the Lincoln-Lemington neighborhood and, more specifically, near Deary Street. (*Id.* at pp. 17, 100, 126). Third, they knew he was a member of a Lincoln-Lemington gang called GMR. (*Id.* at p. 108). Fourth, they

---

[2] This section encompasses the Court's findings of fact as well as its credibility determinations. When ruling on a suppression motion, the Court takes on the role of fact finder and thus "is responsible for assessing the credibility of the testifying witnesses, weighing the evidence, and reaching any 'inferences, deductions and conclusions to be drawn from the evidence.'" *United States v. Cole*, 425 F. Supp. 3d 468, 473 (W.D. Pa. 2019) (quoting *United States v. Harris*, 884 F. Supp. 2d 383, 387 n.2 (W.D. Pa. 2012)).

[3] This unit, which consisted of three detectives, investigated narcotics, gangs, criminal groups and non-fatal shootings. (ECF No. 59, p. 9).

2

knew Alston did not have a valid driver's license.  (*Id*. at pp. 17, 96-97, 123-24).  Fifth, they knew Alston was someone who was involved in criminal activity and known to carry firearms.[4]

After noticing Alston, the detectives turned right onto Deary Street.  They passed Alston in the parked vehicle (a black Hyundai Tucson), and Detective Dettling turned their vehicle around in order to approach behind Alston's vehicle for a more "tactically advantageous position to initiate a traffic stop."  (*Id*. at pp. 11-12, 14, 16, 18, 73-74, 96-97); (Government Exhibit 1).  Detective Dettling saw Alston look into his rear-view mirror, sit up straight in his seat, and quickly look around to the left and right.  (ECF No. 59, pp. 101, 103, 123-24).  Alston then began to drive the vehicle and essentially drove around the block (i.e., put on his turn signal, turned right onto Lincoln Avenue after the light turned green, turned right onto Rowan Street, turned right onto Grapevine Street, and then turned right to return to Deary Street).  He ultimately ended up in the original spot where he was first noticed by the detectives.  (*Id*. at pp. 14, 19-20, 101-04); (Government Exhibit 1).

---

[4] On March 5, 2020, as part of a narcotics investigation, they executed a search warrant on Alston's residence and another house with which he was associated. (*Id*. at pp. 42-44, 46, 97, 108). When officers encountered Alston, he had a firearm on his hip, the smell of marijuana emanated from his vehicle, and there was loose marijuana on the back floorboards of the vehicle. (*Id*. at p. 45). He also had a digital scale on his person. From the residences, law enforcement recovered digital scales, three gun boxes for different firearms, and a Pennsylvania State I.D. card for Alston. (*Id.* at pp. 50-54, 108, 110-12, 126); (Government Exhibits 8 and 13). In a prior incident, on March 7, 2019, Alston's brother was shot in the head. After medics and patrol officers arrived, both detectives observed Alston come across the Larimer Bridge, crying and in an emotional state. He was shirtless and had a gun in his hands. Alston adhered to verbal commands to relinquish his firearm and lay on the ground. At that time, Alston had a valid concealed firearm permit, and the gun was returned to him. (ECF No. 59, pp. 61-62, 135-37); (Government Exhibit 6). Previous to that, on April 8, 2018, Detective Dettling conducted a traffic stop of Alston knowing he did not have a driver's license. Freshly burnt marijuana emanated from the vehicle, and a small amount of marijuana was recovered from the driver's side door and a marijuana cigar was recovered from Alston. (ECF No. 59, p. 134); (Government Exhibit 5). Finally, it was known to both detectives that Alston was arrested on March 5, 2014, for robbery of a pizza delivery driver with a gun. (ECF No. 59, pp. 57-59, 108, 126, 128).

At some point, Detective Burdette activated his body camera.[5] The detectives did not immediately stop Alston because it was their standard operating procedure to use their in-car computer to run vehicle registration and confirm a driver's status. They wanted to ensure that they were correct that Alston did not possess a valid driver's license. This was being done as they followed Alston around the block. (ECF No. 59, pp. 19-21, 23-24, 62-68, 74-75, 104, 141); (Government Exhibits 9 and 14). The detectives followed a few vehicle lengths behind the Hyundai Tucson and no other vehicle came in between. (ECF No. 59, pp. 22, 103). Detective Burdette determined that the Hyundai Tucson was registered to Jasmine Diane Hamm ("Hamm") and that Alston did not possess a valid driver's license.[6] (*Id.* at pp. 23, 28-29, 40, 123, 174-75, 177-79, 187-88, 192-93); (Government Exhibits 2, 9, 10, and 14). Ultimately, the detectives activated their police vehicle's lights within two to three minutes of positioning their vehicle behind the Hyundai Tucson; it was approximately 7:30 p.m. (ECF No. 59, pp. 20-21, 76, 105); (Government Exhibits 2 and 14).

When the vehicles turned right off of Grapevine Street onto Deary Street, Detective Burdette noticed Alston "frantically reaching around the interior of the vehicle towards [ ] the passenger side of the inside of the vehicle." (ECF No. 59, pp. 22, 24-25, 76-77). Although the back of the Hyundai Tucson's windshield was tinted, the outline of Alston's body and his movements were clearly visible to the detectives. (*Id.* at pp. 22-23, 77, 102, 106, 146-47). Detective Dettling observed Alston rise in his seat—his right shoulder rose higher than his left— and then he sat back down, leaned over towards the front passenger floorboard with his right

---

[5] The footage from the camera was admitted into evidence as Government Exhibit 2.

[6] At the hearing, Alston's Certified Driver History was admitted into evidence, which showed that he never had a Pennsylvania driver's license and that his driving privilege has been suspended since March 18, 2019. (*Id.* at pp. 158-61); (Government Exhibit 11).

shoulder out of sight, and then sat back up. (*Id*. at p. 102, 141-42). The detectives had seen Alston with guns in the past and knew him to carry guns. Based on their training and experience, Alston's movements were consistent with someone trying to conceal a weapon, and they were concerned.[7] (*Id*. at pp. 25, 77, 90-91, 106-07, 128-29). Their observations were made as they were pulling to the curb, activating their vehicle's emergency lights, and coming to a stop behind the Hyundai Tucson. (*Id*. at pp. 104, 129).

Detective Burdette exited the police vehicle and approached the Hyundai Tucson stating, "Dajunatae. Hands, hands, hands!" Meanwhile, Detective Dettling stated as he approached, "Stop reaching around, Dajunatae," and he directed Alston to put his hands on the steering wheel. (*Id*. at pp. 24, 105-06); (Government Exhibit 2 at 0:30-0:45). Alston received a call on his cellular phone and it was ringing. Alston was asked to put his phone down and step out of the vehicle. Alston complied. Detective Dettling escorted Alston out of the vehicle and grasped his right arm/wrist. As he did so, Detective Dettling noticed that the car smelled of freshly burnt marijuana, a smell with which he was familiar based on his training and experience. Detective Burdette then grabbed Alston's hands to prevent him from reaching into the vehicle and possibly grabbing a weapon or gun. Detective Burdette asked if Alston had a gun on his person because

---

[7] Detective Dettling credibly explained:

> So my partners and I observed this dozens of times. An individual will remove a firearm from their person and place it within their vehicle at some point. Typically your natural line of drift when you set something down, mainly a firearm, is you're going to roll your hand palm to the floor as opposed to the back of your hand down. So if you recover – retrieve a firearm from your person with your right hand and place it on the passenger floorboard, more times than not the path of the magazine [ ] will be facing the front passenger door and the barrel facing the front of the vehicle.

(*Id*. at pp. 131-32).

of the way Alston was moving, his agitated state, the fact that he saw Alston with guns before, and for the safety of himself and everyone involved. They informed Alston that his license was suspended. Detective Dettling also noticed Alston's behavior to be abnormal from how he typically interacted with them. Alston was very excited, his hands were trembling, he was breathing rapidly, and he wanted to make a phone call. To Detective Dettling, Alston seemed scared. Detective Burdette then placed Alston in handcuffs and brought him to the rear of the Hyundai Tucson to separate him from any weapons possibly in the vehicle. Alston was again told that a traffic stop was initiated because his driver's license was suspended. Detective Burdette tried to get Alston to calm down. Alston wanted to get the owner of the Hyundai Tucson, Hamm, who resided in the corner house near where the vehicle was stopped. Detective Burdette knew this having run the Hyundai Tucson's registration, and he informed Alston that there was no reason to get Hamm. (ECF No. 59, pp. 26-29, 38, 78, 85, 87, 108-09, 112, 129-30, 143; (Government Exhibit 2 at 0:35-1:53).

Meanwhile, Detective Dettling told Alston that the vehicle reeked of marijuana, and he asked if Alston had any weapons.[8] (ECF No. 59, pp. 26, 30-31, 112-13); (Government Exhibit 2 at 1:45-1:56). Detective Burdette added, "Yeah. You've got a scale on you too." (ECF No. 59, pp. 31-33). Detective Burdette observed the scale when Alston stepped out of the vehicle.[9] Alston was wearing an unzipped loose hooded sweatshirt with open loose pockets that were easy to see inside. In Alston's left pocket, Detective Burdette had an unobstructed view of what he knew, based on his training and experience, to be a digital scale. Alston claimed that he did not

---

[8] Detective Burdette also smelled marijuana, with which he was familiar due to his training and experience. (ECF No. 59, p. 33).

[9] Detective Burdette has recovered over one hundred digital scales in his career. The scale Alston had in his pocket was similar to the ones seized from Alston and his residence on March 5, 2020. (*Id*. at pp. 55-56).

know that he "had that shit in his pocket." Detective Burdette retrieved the scale from the left pocket of Alston's sweatshirt and opened it to see if it contained drug residue. (*Id*. at pp. 34-35, 87-88, 113).

At the same time, Detective Dettling noticed an unnatural bulge on the right side of the groin area of Alston's pants, and stated, "There's something there … I can see that." (*Id*. at pp. 113, 147); (Government Exhibit 2 at 2:00-2:15). He then patted the bulge in Alston's pants. Upon touching it, Detective Dettling knew it to be packaged marijuana – it felt like marijuana buds, which he handles daily. Alston asked if the detectives wanted him to take it out, and Detective Burdette told him no, and to wait. The detectives wanted more backup officers on the scene before Alston retrieved anything from his groin area. (ECF No. 59, pp. 37, 38, 114, 148-49); (Government Exhibit 2 at 2:00-2:25). In the meantime, the detectives checked Alston's pockets, the waistband area of his pants, and lifted up his hooded sweatshirt and T-shirt. Detective Burdette retrieved cash, a wallet, a cell phone charger, and bags containing a small amount marijuana from Alston's pockets while he remained handcuffed. (Government Exhibit 2 at 2:35-4:29; Government Exhibit 1). Alston claimed, "it's only a little bit of weed." (Government Exhibit 2 at 4:39). More officers arrived, and Alston was unhandcuffed – only one of his hands was removed. (Government Exhibit 2 at 4:40-55). As Alston retrieved a bag of marijuana from the groin area of his underwear, he started to shove something else further down his pants. Alston retrieved multiple bags from his underwear, threw them on the ground, and stated, "I just bought that shit." (Government Exhibit 2 at 5:13-5:39). Detective Dettling grabbed Alston's hands, Detective Burdette directed Alston to put his hands behind his back, and the detectives re-handcuffed Alston. (ECF No. 59, pp. 40, 90); (Government Exhibit 2 at 5:30-5:45). Detective Burdette patted Alston's groin area again and stated, "He has more down

7

there." Detective Dettling told Alston, "You're just gonna go … you're going anyway." When Alston asked, "I'm going … to jail?" the detectives told him yes and that if he had anything else that they missed, he should retrieve it so as not to be charged with other offenses. They unhandcuffed Alston, and he retrieved more marijuana from the groin area of his underwear. (Government Exhibit 2 at 5:45-6:30).

When Detective Dettling returned to the vehicle, from his position outside the open driver's side door, he saw a firearm in plain view on the front passenger floorboard. Its barrel was facing the front of the vehicle, and its magazine was facing the front passenger door. Detective Dettling leaned into the vehicle and recovered the firearm (a Black Taurus PT111), which was clearly accessible to someone sitting in the driver's seat of the vehicle. (ECF No. 59, pp. 118-21, 131, 151); (Government Exhibit 2 at 6:36-7:42). Alston claimed the gun belonged to someone else. (Government Exhibit 2 at 7:42-7:47). Three burnt marijuana cigars (roaches) were recovered from the dashboard ashtray. A small bag of marijuana, a marijuana cigar and loose marijuana were recovered from the dashboard cup holder. A Samsung Smartphone was recovered from the driver's seat, and a digital scale was recovered from the rear driver's floor. (ECF No. 59, pp. 42, 132); (Government Exhibit 1).

## II.     ANALYSIS

The Fourth Amendment safeguards the "right of the people to be secure . . . against unreasonable searches and seizures." U.S. Const. amend. IV.[10] "As a general rule, the burden of

---

[10] Article 1, Section 8 of the Pennsylvania Constitution is the state analogue to the Fourth Amendment of the federal constitution. The Pennsylvania Supreme Court has recognized that Article I, Section 8 of the state constitution provides broader protections than the Fourth Amendment. *Commonwealth v. DeJohn*, 403 A.2d 1283 (Pa. 1979). Alston does not allege any violation of his right to privacy based upon Article I, Section 8 of the Pennsylvania Constitution. This is because the United States Court of Appeals for the Third Circuit has held that a defendant's state-secured rights, constitutional or otherwise, are of no consequence when the

proof is on the defendant who seeks to suppress evidence." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995) (citation omitted).  The starting point is to determine whether the seizure occurred without a warrant.  When a defendant, like Alston, asserts that the Government seized him without a warrant, he easily clears his initial burden.  "The burden then shifts to the government to prove by a preponderance of the evidence that the officer's seizure of the defendant reflected the protections of the Fourth Amendment." *United States v. Wilburn*, No. 18-115, 2021 WL 1310423, at *22 (W.D. Pa. Apr. 8, 2021) (citations omitted).  As there is no dispute that Alston was seized without a warrant (through the traffic stop), the Government bears the burden of showing that the Fourth Amendment was not violated.  The Court finds that it did so for the following reasons of law and fact.

### A.  A valid traffic stop occurred.

"A traffic stop is a 'seizure' within the meaning of the Fourth Amendment, 'even though the purpose of the stop is limited and the resulting detention quite brief.'" *United States v. Delfin-Colina*, 464 F.3d 392, 396 (3d Cir. 2006) (quoting *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)).  Further, "[i]t is well-established that a traffic stop is lawful under the Fourth Amendment where a police officer observes a violation of the state traffic regulations." *United States v. Moorefield*, 111 F.3d 10, 12 (3d Cir. 1997) (citations omitted).  It need only be

---

defendant is prosecuted by the federal government. *United States v. Rickus*, 737 F.2d 360, 363–64 & n.1 (3d Cir.1984); *United States v. Bedford*, 519 F.2d 650, 653–54 & nn.1–3 (3d Cir. 1975); *United States v. Scolnick*, 392 F.2d 320, 323–26 (3d Cir. 1967); *cf. United States v. Shaffer*, 520 F.2d 1369, 1372 (3d Cir. 1975); *United States v. Armocida*, 515 F.2d 49, 51–52 (3d Cir. 1975); *United States v. Stiver*, 9 F.3d 298, 300 (3d Cir. 1993) ("Evidence obtained in accordance with federal law is admissible in federal court—even though it was obtained by state officers in violation of state law." (quoting *Rickus*, 737 F.2d at 363–64)).  The Court must judge the detectives' conduct solely under federal standards as it must decide evidence questions on the basis of federal, rather than state, law.

supported by reasonable suspicion that a traffic violation occurred.[11]  *United States v. Green*, 897 F.3d 173, 178 (3d Cir. 2018) (citations omitted).  In other words, while reasonable suspicion is "a generally undemanding standard," a police officer bears the "initial burden of providing . . . specific, articulable facts to justify a reasonable suspicion to believe that an individual has violated the traffic laws."  *Delfin-Colina*, 464 F.3d at 396 (cleaned up) (citations omitted).  "[A]ny technical violation of a traffic code legitimizes a stop, even if the stop is merely pretext for an investigation of some other crime."  *United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006) (citing *Whren v. United States*, 517 U.S. 806 (1996)); *see also United States v. Lewis*, 672 F.3d 232, 237 (3d Cir. 2012) ("[P]retextual traffic stops supported by reasonable suspicion do not run afoul of the Fourth Amendment.").

The Court finds that the evidence presented supports the Government's position that the traffic stop of the Hyundai Tucson was valid.  It accepts Alston's concession in his Supplemental Brief that the detectives "were justified in pulling [him] over for driving with a suspended license."  (ECF No. 62, p. 4).  Detectives Burdette and Dettling credibly testified that they had a clear, unobstructed view of Alston, they immediately recognized him, they knew he did not have a valid driver's license, and they confirmed on their in-car computer while following Alston around the block that he had a suspended driver's license.  Accordingly, the detectives had reasonable suspicion to believe that a traffic violation occurred—a violation of 75 Pa. C.S. §

---

[11] This standard is "a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Delfin-Colina*, 464 F.3d at 396 (citations omitted). In assessing reasonable suspicion, a court must examine the totality of the circumstances, *United States v. Silveus*, 542 F.3d 993, 1000 (3d Cir. 2008), through the lens of officer training and experience, *see United States v. Cortez*, 449 U.S. 411, 418 (1981).  The Third Circuit has given considerable deference to police officers' determinations of reasonable suspicion. *See, e.g.*, *United States v. Nelson*, 284 F.3d 472, 482 (3d Cir. 2002).

1543, driving while operating privilege is suspended or revoked.[12] The stop of the vehicle Alston was operating was, therefore, reasonable under the Fourth Amendment. *See Whren*, 517 U.S. at 810; *Moorefield*, 111 F.3d at 12.

### B. The removal of Alston from the vehicle and pat-down was valid.

"After a traffic stop that was justified at its inception, an officer who develops a reasonable, articulable suspicion of criminal activity may expand the scope of an inquiry." *United States v. Givan*, 320 F.3d 452, 458 (3d Cir. 2003). As "[t]he Supreme Court has repeatedly recognized," "traffic stops are dangerous encounters that result in assaults and murders of police officers." *Moorefield*, 111 F.3d at 13 (citations omitted). It is well-settled that a police officer executing a valid traffic stop "may exercise reasonable superintendence over the car and its passengers." *United States v. Bonner*, 363 F.3d 213, 216 (3d Cir. 2004). Thus, after a car has been legally stopped, "the police may 'escalate' the encounter by visually inspecting the interior of the car, and checking credentials and asking questions of the occupants." *Mosley*, 454 F.3d at 252.

As a preliminary matter, the detectives were entirely justified in ordering Alston out of the vehicle, handcuffing him, and checking him for concealed weapons. *See, e.g.*, *United States v. Yamba*, 407 F. Supp. 2d 703, 708 (W.D. Pa. 2006), *aff'd*, 506 F.3d 251 (3d Cir. 2007) (explaining that two Supreme Court cases, *Pennsylvania v. Mimms*, 434 U.S. 106 (1977), and *Maryland v. Wilson*, 519 U.S. 408 (1997), "demonstrate that a police officer may order the driver

---

[12] The Court can take judicial notice of the applicable Pennsylvania motor vehicle code provisions. *See Lamar v. Micou*, 114 U.S. 218, 223 (1885) ("The law of any State of the Union, whether depending upon statutes or upon judicial opinions, is a matter of which the courts of the United States are bound to take judicial notice, without plea or proof."); *Est. of Rockwell v. Comm'r*, 779 F.2d 931, 936 n.5 (3d Cir. 1985) ("We take judicial notice of the law of Pennsylvania as expressed in statutes and court decisions."); *Dean v. Specialized Sec. Response*, 876 F. Supp. 2d 549, 556 n.4 (W.D. Pa. 2012) ("Federal courts are required to take judicial notice of state statutes.").

11

and passengers to exit the vehicle while the stop is being conducted"); *United States v. Bellinger*, 343 F. Supp. 2d 417, 419 (E.D. Pa. 2004), *aff'd*, 284 F. App'x 966 (3d Cir. 2008) (same). A police officer "may pat down the occupants of the vehicle and conduct a search of the passenger compartment, if he has a reasonable suspicion that the occupants might be armed and dangerous." *Bonner*, 363 F.3d at 216; *see also United States v. Colen*, 482 F. App'x 710, 711 (3d Cir. 2012) ("[W]here—as here—police conduct a valid traffic stop[,] they may conduct a limited search for weapons by patting-down the driver and/or occupants of the stopped vehicle for their own protection."); *United States v. Goode*, 486 F. App'x 261, 264 (3d Cir. 2012) (holding the police only needed a reasonable suspicion that they were dealing with an armed and dangerous individual to permit a reasonable search for weapons); *Yamba*, 407 F. Supp. 2d at 708 ("Moreover, the Court of Appeals for the Third Circuit has recognized that . . . many courts of appeals have upheld limited weapon pat-downs of passengers where the passengers have engaged in suspicious behavior." (citation omitted)).

In assessing whether reasonable suspicion existed, this Court must consider the totality of the circumstances. The Third Circuit has recognized that "[c]ourts give considerable deference to police officers' determinations of reasonable suspicion." *Mosley*, 454 F.3d at 252. One factor courts have considered in assessing whether officers have reasonable suspicion is whether other occupants of the vehicle possess weapons or other potentially dangerous implements. *See United States v. Bellinger*, 343 F. Supp. 2d 417, 420 (E.D. Pa. 2004); *see also United States v. Burton*, 532 F. App'x 171, 174 (3d Cir. 2013) (sufficient basis existed to have occupants exit the vehicle and conduct a protective frisk). "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted

12

in the belief that his safety or that of others was in danger." *Terry v. Ohio*, 392 U.S. 1, 27 (1968).

The Court finds the detectives' testimony credible. They identified specific and articulable facts which, taken together with rational inferences from those facts, demonstrate they possessed reasonable suspicion that Alston was armed and dangerous. First, from their past experiences with Alston, they knew he oftentimes possessed a firearm. Second, the detectives' concern about the presence of a firearm was heightened during this particular encounter because of Alston's furtive movements inside the vehicle. Detective Burdette noticed Alston "frantically reaching around the interior of the vehicle towards [ ] the passenger side of the inside of the vehicle." (ECF No. 59, pp. 22, 24-25, 76-77). Detective Dettling observed Alston rise in his seat—his right shoulder rose higher than his left—and then he sat back down, leaned over towards the front passenger floorboard with his right shoulder out of sight, and then sat back up. (*Id*. at pp. 102, 141-42). Based on their training and experience, Alston's movements were consistent with someone trying to conceal a weapon, and they were justifiably concerned about their safety as well as the safety of anyone nearby. (*Id*. at pp. 25, 77, 90-91, 106-07, 128-29). Based on all of these circumstances, the Court holds that the officers were more than justified in removing Alston from the vehicle with the intention to check for concealed weapons.

The Court further holds that the detectives took only "such steps as were reasonably necessary to protect their personal safety and to maintain the *status quo* during the course of the stop." *United States v. Hensley*, 469 U.S. 221, 235 (1985). The detectives never drew their weapons. They directed Alston to exit the vehicle, and he complied. The detectives handcuffed Alston and took him to the rear of the Hyundai Tucson to conduct the pat-down. All of this was permissible.

Having concluded that the detectives had reasonable suspicion that Alston was armed and that the removal of him from the Hyundai Tucson was appropriate—the Court must ask whether the detectives exceeded the scope of the limited search allowed under *Terry*.[13] Here, Alston's behavior was abnormal compared to how he typically interacted with the detectives; he was very excited, his hands were trembling, and he was breathing rapidly. Before beginning the limited pat-down search for weapons, Detective Burdette observed a digital scale in Alston's left sweatshirt pocket in plain view, and Detective Dettling observed a clear bulge in Alston's groin area. What occurred next was the result of a fluid process that cannot easily be divided into chronological sequence as events occurred in concert.

As to the digital scale in Alston's sweatshirt pocket, the Court holds that it was lawfully seized. Police may lawfully seize contraband without a warrant if they "are lawfully in a position from which they view [the] object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object." *Dickerson*, 508 U.S. at 375. In the unique circumstances of this case, the Court finds that the digital scale's incriminating nature as drug paraphernalia was immediately apparent to Detective Dettling. Not only did the vehicle reek of marijuana, but Detective Burdette handled digital scales and other drug paraphernalia connected to Alston less than two months earlier. Both detectives were involved in a drug-trafficking investigation that resulted in the execution of two search warrants at homes associated with Alston. Alston was known to the detectives to be involved in drug trafficking. Detective Burdette's experience and training in drug identification and detection,

---

[13] Although the purpose of a pat-down must be circumscribed to searching for weapons, an officer need not turn a blind eye to some other form of contraband that he discovers during a valid weapons search. "Regardless of whether the officer detects the contraband by sight or by touch, however, the Fourth Amendment's requirement that the officer have probable cause to believe that the item is contraband before seizing it ensures against excessively speculative seizures." *Minnesota v. Dickerson*, 508 U.S. 366, 376 (1993).

along with his experience in making multiple drug arrests—which familiarized him with the type of digital scales used in drug trafficking—led him to conclude with near certainty that the scale he observed in Alston's pocket was contraband, especially since it was nearly identical to those seized from Alston only two months earlier. In determining whether the incriminating nature of an item was immediately apparent, the Court must not hold police to "an unduly high degree of certainty as to the incriminatory character of evidence." *Texas v. Brown*, 460 U.S. 730, 741 (1983). Instead, it must determine whether, from the perspective of the detective and the degree of observation he took before seizing the object, that there was probable cause that the item contained, or was itself, incriminating evidence. Based on the record before it, the Court simply cannot conclude that Alston's possession of the scale was innocuous. Detective Dettling gave a credible explanation as to why he believed the digital scale was immediately apparent as drug paraphernalia, and the Court finds he was justified in removing the scale from Alston's pocket.

As to the pat-down of Alston's groin region, which the Court finds occurred at the same time as Detective Dettling removed the scale, it too was lawful. Detective Dettling noticed an unnatural bulge on the right side of the groin area of Alston's pants, and stated, "There's something there … I can see that." (ECF No. 59, pp. 113, 147); (Government Exhibit 2 at 2:00-2:15). He patted the bulge in Alston's pants. Upon touching it, Detective Dettling knew it to be packaged marijuana – it felt like marijuana buds, which he handles daily. His belief was reached quickly and upon minimal manipulation of Alston's pants from the outside, consistent with a routine frisk allowed by *Terry*. Alston stated that he was willing to remove the marijuana from his groin area, but the detectives wanted more backup officers on the scene before he did so. (ECF No. 59, pp. 37, 38, 114, 148-49); (Government Exhibit 2 at 2:00-2:25). After carefully reviewing the video footage, the Court concludes that Alston acknowledged he had marijuana

15

secreted in his pants. Seizure of the marijuana was permissible because, during the frisk for weapons, Detective Dettling felt an object whose "contour or mass makes its identity [as contraband] immediately apparent."[14] *Dickerson*, 508 U.S. at 375-76.

All this said, the Court concurs with the Government that the detectives had probable cause to conduct a more intrusive search than that authorized by *Terry* alone. "The probable cause inquiry is 'commonsense,' 'practical,' and 'nontechnical;' it is based on the totality of the circumstances and is judged by the standard of 'reasonable and prudent men.'" *United States v. Donahue*, 764 F.3d 293, 301 (3d Cir. 2014) (quoting *Illinois v. Gates*, 462 U.S. 213, 230-31 (1983)). The Court must "evaluate 'the events which occurred leading up to the search, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause.'" *Id.* (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996) (ellipses and brackets omitted). "If there was a 'fair probability that contraband or evidence of a crime' would have been found, there was probable cause […]." *Id.* (quoting *Gates*, 462 U.S. at 238). "Probable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts […]." *Gates*, 462 U.S. at 232. Here, the Court finds that the detectives had probable cause.

Under the Fourth Amendment, an officer has the authority to make a custodial arrest where he has probable cause to believe that a misdemeanor offense has been committed in his presence. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in

---

[14] In applying the "plain feel" doctrine, the Court focuses on "whether the officer had probable cause to believe an object was contraband before he knew it not to be a weapon and whether he acquired that knowledge in a manner consistent with a routine frisk." *United States v. Yamba*, 506 F.3d 251, 259 (3d Cir. 2007) (emphasis omitted). Thus, the detective was "allowed to slide or manipulate an object in a suspect's pocket, consistent with a routine frisk, until the officer is able reasonably to eliminate the possibility that the object is a weapon." *Id.*

16

his presence, he may, without violating the Fourth Amendment, arrest the offender."). Alston's act of driving while his operating privilege was suspended, the presence of contraband (drug paraphernalia in plain view in his pocket and marijuana in his groin region), and the smell of marijuana in the vehicle provided probable cause to arrest Alston.[15] The detectives were lawfully permitted to conduct a search incident to arrest. *See Arizona v. Gant*, 556 U.S. 332, 338 (2009).

While the detectives were awaiting further backup to retrieve the marijuana from Alston's groin area, they checked Alston's pockets, the waistband area of his pants, and lifted up his hooded sweatshirt and T-shirt. The Court finds that Detective Burdette was justified in removing items (i.e., cash, a wallet, a cell phone charger, and bags containing a little bit of marijuana (Government Exhibit 2 at 2:35-3:31; Government Exhibit 1)) from Alston's pockets. More officers arrived, and Alston was unhandcuffed. (Government Exhibit 2 at 4:40-55). As Alston retrieved a bag of marijuana from his underwear, he started to shove something else further down his underwear. Alston also stated, "I just bought that shit." (Government Exhibit 2 at 5:13-6:39). Detective Dettling grabbed Alston's hands, Detective Burdette directed Alston to put his hands behind his back, and the detectives re-handcuffed him. (ECF No. 59, pp. 40, 90); (Government Exhibit 2 at 5:30-5:45). After realizing that he was going to jail and being given the opportunity to disclose anything else hidden on him, Alston was unhandcuffed again. He

---

[15] "It is well settled that the smell of marijuana alone, if articulable and particularized, may establish not merely reasonable suspicion, but probable cause." *United States v. Registe*, 830 F. App'x 708, 710 (3d Cir. 2020) (explaining that Third Circuit case law recognizes that the smell of marijuana can provide probable cause (citing *United States v. Ramos*, 443 F.3d 304, 308 (3d Cir. 2006))); *see also United States v. Jackson*, 682 F. App'x 86, 87–88 & n.1 (3d Cir. 2017) (recognizing that an officer has probable cause to arrest "[s]o long as an officer smells the odor of marijuana and can localize its source with sufficient particularity"). Given the fluid series events, the Court finds probable cause to arrest existed even before the digital scale was removed from Alston's pocket.

then retrieved more marijuana from underneath his underwear. (Government Exhibit 2 at 5:45-6:30). Alston was then placed in a police vehicle for transport to the jail. (Government Exhibit 2 at 8:30).

The Court does not find the timing of the search, *i.e.*, that it preceded the formal arrest, particularly dispositive in the unique circumstances of this case. *See Rawlings v. Kentucky*, 448 U.S. 98 (1980). The detectives took concrete steps towards effectuating an arrest of Alston based on probable cause that he committed various criminal offenses. The search ended at the 6:36 mark on the video, and Alston was placed in the police vehicle for transport to jail at the 8:30 mark. (Government Exhibit 2 at 6:36-8:30). For the reasons explained above, the detectives had probable cause to arrest Alston before they began to search his person. The Court is of the firm opinion that what occurred did not run afoul of the Fourth Amendment, which does not impose such a rigid sequence that officers in the field are required to follow.

### C. The protective sweep of the vehicle was valid.

A police officer may conduct "a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual." *Terry*, 392 U.S. at 27. "This exception also allows officers to search the passenger area of a vehicle without probable cause or a warrant if they conduct a lawful stop and reasonably believe that the suspect is dangerous and has a weapon inside." *United States v. Davis*, 726 F.3d 434, 439 (3d Cir. 2013) (*citing Michigan v. Long*, 463 U.S. 1032, 1049–50 (1983)). When deciding to conduct this type of limited search, "'an officer need not be absolutely certain that the individual is armed' so long as the officer's concern was objectively reasonable." *United States v. Kithcart*, 218 F.3d 213, 219 (3d Cir. 2000) (*quoting Moorefield*,

111 F.3d at 13–14). An officer may conduct a protective 'frisk' of the passenger compartment even when the vehicle's occupants are outside of the vehicle. *Michigan*, 463 U.S. at 1051-52.

The Court holds that the detectives had the authority to engage in a protective sweep of the vehicle for weapons. *See Colen*, 482 F. App'x 710 (holding officers acted reasonably in conducting a protective search of defendant's vehicle during a traffic stop); *United States v. Ortiz*, 716 F. App'x 83 (3d Cir. 2017) (same). After Alston was notified that he would be transported to the jail, Detective Dettling returned to the vehicle as the driver's side door of the Hyundai Tucson remained open. From his position outside the door, Detective Dettling saw a firearm in plain view on the front passenger floorboard. Its barrel was facing the front of the vehicle, and its magazine was facing the front passenger door. Detective Dettling leaned into the vehicle and recovered the firearm (a Black Taurus PT111), which was clearly accessible to someone sitting in the driver's seat of the vehicle. (ECF No. 59, pp. 118-21, 131, 151); (Government Exhibit 2 at 6:36-7:42). The Court holds that, pursuant to the plain view doctrine, the officers lawfully seized the firearm as well as other contraband (i.e., three burnt marijuana cigars (roaches) from the dashboard ashtray; a small bag of marijuana, a marijuana cigar and loose marijuana from the dashboard cup holder; a Samsung Smartphone from the driver's seat; and a digital scale from the rear driver's floor (ECF No. 59, pp. 42, 132); (Government Exhibit 1)).[16]

---

[16] The search of the vehicle was also permissible under the automobile exception to the warrant requirement, which permits vehicle searches without a warrant when there is probable cause to believe that the vehicle contains evidence of a crime. *Donahue*, 764 F.3d at 299-300.

### III.     CONCLUSION

For the foregoing reasons of law and fact, the Court concludes that Alston's Fourth Amendment rights were not violated, and his Motion to Suppress Evidence (ECF No. 38) will be denied.  An Order of Court will follow.

BY THE COURT:

s/   William S. Stickman IV
WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

Date:   June 13, 2022